IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 14-00290-KD-C |
| ) | Civil Action No. 15-00611-KD-C |
| DENZIL EARL MCKATHAN, ) | |
| ) | |
| Defendant. ) | |

## ORDER

This action is before the Court on remand and vacatur from the Court of Appeals for the Eleventh Circuit. (Doc. 123; issued as mandate, Doc. 124). The Eleventh Circuit vacated the denial of Defendant Denzil Earl McKathan's Section 2255 motion finding, "because McKathan would have prevailed on the Fifth Amendment suppression issue, it now becomes necessary to consider whether the evidence would have otherwise been admissible." (Doc. 123 at 36-37). On remand, the Eleventh Circuit said "the government must receive an opportunity to present any evidence and arguments to show that the evidence from McKathan's phone would have otherwise been admissible, and the district court shall rule on any such arguments." (Id. at 37). Thereafter, the parties filed briefs addressing the issues raised by the Eleventh Circuit in the remand order. (Docs. 126, 135). And, on February 4, 2021 the undersigned held an evidentiary hearing to address same. Present at the hearing were Defendant Denzil Earl McKathan, and his counsel Arthur Madden, and Assistant United States Attorneys Christopher Bodnar and Keith Jones.

### I. Background

In 2005, Defendant Denzil Earl McKathan (McKathan) pled guilty to possessing child pornography in violation of 18 U.S.C. § 2252A(a). United States v. McKathan, Case No. 1:05-cr-00094-CG (S.D. Ala. 2005) (McKathan I). He was sentenced to 27 months' imprisonment, followed by a lifetime term of supervised release. (McKathan I, Doc. 23). The written judgment set forth both standard conditions of release as well as five special conditions of supervision.

(McKathan I, Id. at 4, 7). Relevant here, is a term of supervised release required McKathan "answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer." (McKathan I, Id. at 4). Another condition required he "shall submit" to his probation officer's reasonable searches of his home. (McKathan I, Id. at 7). This condition also subjected McKathan to reasonable searches of electronic devices. This was necessary so that the Probation Office could determine if McKathan was in compliance with his term of supervision which prohibited "possess[ion] or use a computer with access to any 'on-line computer service' at any location (including employment) without the permission of the Probation Office.'" (McKathan I, Id.).

McKathan began living under the terms of his supervised release in 2007 after he completed his prison term. In September 2014, McKathan's probation officer, Rafael Goodwin, Jr., (Goodwin) discovered someone had opened a Facebook account in McKathan's name using an Android device. As a result, on September 19, 2014, Goodwin conducted a surprise visit at McKathan's apartment to investigate.

Upon arriving at McKathan's home, Goodwin spotted an Android phone on McKathan's bed. Goodwin asked McKathan whether he had a new phone. Goodwin was aware that McKathan had a cell phone, but was not aware that he had a "smart phone," i.e. a phone capable of internet access. Goodwin requested to see the phone and McKathan handed it to him. Goodwin could not open the phone because it was password protected. Goodwin handed the phone back to McKathan and asked him to put in the passcode; McKathan complied. Goodwin found a Facebook application on McKathan's phone; McKathan confirmed the Facebook account was his. Goodwin did not find inappropriate content on the Facebook account but he then reviewed McKathan's internet history. "The browsing history reflected that somebody had visited sites with terms such as 'preteen' and 'sexy lil girls.'" McKathan, 969 F.3d at 1218. After seeing this, Goodwin asked McKathan whether he had been viewing child pornography and McKathan conceded he had.

Goodwin confiscated the phone and instructed McKathan to report to Goodwin on September 22, 2014. Goodwin further inspected McKathan's phone at the Probation Office and he found downloaded images of child pornography.

Thereafter, the Court held a hearing and determined McKathan's supervised release should be revoked. He was sent back to prison to be followed by a reimposed term of supervised release for life, with the same conditions that had originally been imposed.

Goodwin also provided the U.S. Attorney's Office with copies of the images he found on McKathan's phone. Goodwin gave the Department of Homeland Security McKathan's phone so they could seek a search warrant. Homeland Security procured a warrant for the phone and accessed the phone with the PIN McKathan provided to Goodwin.

In November 2014, a federal grand jury charged McKathan with three counts of knowingly receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) (Counts One to Three), and one count of knowingly possessing material containing an image of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) (Count Four). United States v. McKathan, Case No. 1:14-cr-00290 (S.D. Ala. 2014) (McKathan II). Since Knight was familiar with the case from the revocation hearing, the Court appointed him to represent McKathan on the new charges. McKathan then filed a *pro se* motion requesting new counsel; the court granted his request and appointed Cindy Powell. McKathan, 969 F.3d at 1219.

Next, McKathan filed a *pro se* motion to suppress arguing "(1) any and all evidence seized as a result of any search and/or seizure and the fruits of any search and/or seizure, [and] (2) any and all written and/or oral statements taken from me and the fruits of any such statements." McKathan's attorney thereafter filed an amended motion to suppress on McKathan's behalf. The court ultimately denied McKathan's motion to suppress. On advice of counsel, McKathan then entered into a plea agreement with the government. "Under that agreement, McKathan pled guilty to one count of knowingly receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). He also agreed to waive his right to appeal and to file a collateral attack, with

3

limited exceptions." McKathan, 969 F.3d at 1220. This waiver did not preclude McKathan from claiming ineffective assistance of counsel in a motion filed under 28 U.S.C. § 2255. The district court imposed a term of 188 months in prison. McKathan did not directly appeal his conviction.

In November 2015, McKathan filed a *pro se* habeas petition to vacate, set aside, or correct his conviction in the 2014 Case under 28 U.S.C. § 2255. McKathan v. United States, Case No. 1:15-cv-00611-KD (S.D. Ala. 2015) (McKathan III). He asserted that his counsel had been ineffective, in violation of the Sixth Amendment, because they did not challenge the admission of his statements and the fruits of those statements, all of which, McKathan alleged, had been obtained in violation of the Fifth Amendment. With the assistance of newly appointed counsel, Arthur Madden, McKathan filed an amended habeas petition asserting that his previous counsel (both Knight and Powell) were constitutionally deficient for failing to argue a Fifth Amendment violation as a basis to suppress his statements to Goodwin about his phone and his PIN, as well as the evidence derived from the phone.

The Magistrate Judge held an evidentiary hearing on McKathan's Section 2255 petition and issued a report and recommendation ("R&R") recommending that the district court deny McKathan's § 2255 claim that he received ineffective assistance of counsel when his attorneys did not seek under the Fifth Amendment to suppress his statements and their fruit. The R&R, which ruled based solely on its finding that McKathan had failed to show prejudice, was adopted by the District Court.

McKathan then moved pursuant to Rule 59(e), Fed. R. Civ. P., for the District Court to vacate its judgment and grant his denied ineffective-assistance claim. In the alternative, McKathan asked the district court to issue a Certificate of Appealability ("COA") on the question of "whether the district court erred in finding that [he] failed to prove Strickland's prejudice prong of his second § 2255 claim." McKathan, 969 F.3d at 1222. The district court rejected McKathan's request to vacate its prior judgment, but granted a COA. McKathan appealed.

4

The Eleventh Circuit held McKathan would have prevailed on a Fifth Amendment suppression because McKathan's statements to Goodwin were compelled in violation of the Fifth Amendment. The Eleventh Circuit remanded to this Court to determine whether the evidence derived from McKathan's statements would have been otherwise admissible. If the evidence would have otherwise been admissible, the Eleventh Circuit instructed this Court to deny McKathan's Section 2255 motion "since filing the Fifth Amendment suppression motion would not have been reasonably likely to change the outcome in McKathan II." McKathan, 969 F.3d at 1233. However, if on remand this Court determine the evidence would not have been otherwise admissible, this Court must then address "whether McKathan's counsel performed deficiently by failing to raise the Fifth Amendment issue in McKathan II." Id.

**II.   Discussion**

   A. Admissibility of Evidence

As a threshold matter, McKathan contends the applicable standard is whether the evidence derived from his statements came from a wholly independent source. McKathan also contends that though the Eleventh Circuit discussed the issue in terms of the inevitable discovery doctrine, that this Court is not confined to the inevitable discovery doctrine.

The Eleventh Circuit, after concluding McKathan's statements were compelled in violation of the Fifth Amendment, turned to "whether the fruits of McKathan's statements would have nonetheless been admissible for an independent reason." McKathan, 969 F.3d at 1231. The Eleventh Circuit then notes "the government suggests that it would have inevitably discovered the evidence…" Id. au 1332. The Court briefly discusses the inevitable discovery doctrine. Id. It then explains that "since the district court determined that McKathan could not prevail on his Fifth Amendment argument[,]" "the district court had no reason to analyze—and the government had no reason to argue—whether the inevitable discovery doctrine could apply[.]" Id. From this, the Eleventh Circuit stated: "As a result, we cannot evaluate, in the final analysis, whether there was a reasonable likelihood that the outcome of McKathan's case would have been different, had his

5

counsel filed a suppression motion based on the Fifth Amendment. But because McKathan would have prevailed on the Fifth Amendment suppression issue, it now becomes necessary to consider whether the evidence would have otherwise been admissible." Id.

Before delving into the differences of these standards, it's necessary to understand their origins. "In the 20th century,… the exclusionary rule—the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial—became the principal judicial remedy to deter Fourth Amendment violations." Utah v. Strieff, 136 S.Ct. 2056, 2061 (2016) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)). "Under the [Supreme] Court's precedents, the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and,…'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Id. (citing Segura v. United States, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). This doctrine equally applies to fruits of evidence obtained in violation of an accused's Sixth Amendment rights, as well as in violation of an accused's Fifth Amendment rights. U.S. v. Terzado-Madruga, 897 F.2d 1099, 1113 (11th Cir. 1990). And see Lundberg v. Secretary, Florida Department of Corrections, 808 Fed.Appx. 725, 732 (11th Cir. 2020) (citing Terzado-Madruga and applying fruit of the poisonous tree doctrines to Fifth Amendment case). Because of the significant ramifications of this rule, the Supreme Court has deemed it "applicable only…where its deterrence benefits outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (internal quotation marks omitted). "Suppression of evidence…has always been our last resort, not our first impulse." Id.

Accordingly, the Supreme Court has recognized exceptions to this rule. Strieff, 136 S.Ct. at 2061. In Utah v. Strieff, 136 S.Ct. 2056, the Supreme Court explained:

> Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. See Murray v. United States, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

6

>Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. See *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Third, and at issue here, is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson, supra,* at 593, 126 S.Ct. 2159.

136 S.Ct. at 2061.

These three exceptions are "closely related but analytically distinct." United States v. Terzado-Madruga, 897 F.2d at 1113. Illustrative of the interrelatedness of these exceptions is an example the Supreme Court gave in Murray v. U.S., 487 U.S. 553, 539 (1988):

>We recently assumed this application of the independent source doctrine (in the Sixth Amendment context) in *Nix v. Williams, supra.* There incriminating statements obtained in violation of the defendant's right to counsel had led the police to the victim's body. The body had not in fact been found through an independent source as well, and so the independent source doctrine was not itself applicable. We held, however, that evidence concerning the body was nonetheless admissible because a search had been under way which would have discovered the body, had it not been called off because of the discovery produced by the unlawfully obtained statements. *Id.,* 467 U.S., at 448–450, 104 S.Ct., at 2511–12. This "inevitable discovery" doctrine obviously assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. It would make no sense to admit the evidence because the independent search, had it not been aborted, would have found the body, but to exclude the evidence if the search had continued and had in fact found the body. The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.

487 U.S. at 539. So, even if illegally obtained evidence was not also found through an independent source, the evidence is still admissible if it inevitably would have been discovered. Id. Only one exception need apply for the evidence to be admissible notwithstanding a prior illegality. Accordingly, since there is no information that the child pornography would have been discovered through an independent source, the standard to apply is whether it would inevitably have been discovered.

7

> In United States v. Watkins, 981 F.3d 1224 (11th Cir. 2020) the Eleventh Circuit explained:
>
>> Illegally obtained evidence is admissible under the inevitable discovery exception if the government can make two showings. One is a showing that if there had been no constitutional violation there is "a reasonable probability that the evidence in question would have been discovered by lawful means." Johnson, 777 F.3d at 1274 (quotation marks omitted); accord United States v. Terzado-Madruga, 897 F.2d 1099, 1114 (11th Cir. 1990). That does not require establishing an "absolute inevitability of discovery but simply a reasonable probability that the evidence in question would have been discovered other than by the tainted source." United States v. Brookins, 614 F.2d 1037, 1042 n.2 (5th Cir. 1980).[2] The other requirement the government must meet is "that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Johnson, 777 F.3d at 1274 (quotation marks omitted). But "active pursuit" in this sense does not "require that police have already planned the particular search that would obtain the evidence" but only "that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession." Id. (quotation marks omitted).
>
> 981 F.2d at 1233.

The first issue is whether Goodwin could have obtained access to the phone contents by legal means. In United States v. Knights, 534 U.S. 113, 118-19 (2001), the Supreme Court examined the reasonableness of a warrantless search by a law-enforcement officer of a probationer for investigative purposes. 534 U.S. at 115-16. The Court explained "that the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Id. at 118-19. "Because probationers subject to a condition authorizing warrantless searches have a greatly diminished expectation of privacy, while the government has a considerable interest in supervising probationers, the [Supreme] Court held that warrantless searches of a probationer subject to a search condition based on reasonable suspicion are reasonable under the Fourth Amendment." United States v. Bishop, 683 Fed.Appx. 899, 908

(citing Knights, 534 U.S. at 118-19).[1] "Reasonable suspicion exists when, under the totality of the circumstances, officers have a particularized and objective basis for suspecting legal wrongdoing." Id. (citing United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005)).

There was sufficient reasonable suspicion to search McKathan's phone. Goodwin lawfully learned through a public search of Facebook[2] that a Facebook account in McKathan's name was accessed with an Android.[3] Thereafter, when he made a surprise visit to McKathan's home, Goodwin saw an Android phone in plain view. The Android phone had a touchscreen and appeared to be capable of accessing the internet. McKathan lived alone and no one else was present. At this point, considering McKathan's history of using the internet to possess child pornography and his SRT term prohibiting internet access without permission, Goodwin testified that his intent was to seize the phone regardless of McKathan's answers to his questions.[4] Moreover, without the PIN, Goodwin testified that he would have reached out to other law enforcement agencies and found a way to access the information on the phone.

Kevin Levy, a former Secret Service agent and expert in cybercrime forensics, opined that starting in 2012 technology existed to get past the PIN code on this model of the Android phone.

---

[1] The Eleventh Circuit has also extended Knights to a situation where no warrantless search condition existed. See United States v. Yuknavich, 419 F.3d 1302, 1309-10 (11th Cir. 2005). There, the defendant was a sex-offender probationer subject to internet and computer usage restrictions. Id. at 1304-05, 1310. The Court reasoned that because of these limitations, in combination with the crime for which defendant was convicted the defendant's expectation of privacy in his computer were greatly diminished and no more than reasonable suspicion was needed to search his computer. Id. at 1310. Plus, the Court held the defendant should have been prepared to answer questions about his internet usage and to have "the officers…conduct their own research to find the answers." Id

[2] Goodwin testified that as part of his supervision of sex offenders, he conducts Internet searches to see if the search returns for open Internet profiles of his supervisees.

[3] The Facebook profile indicated the user accessed Facebook via "Facebook for Android."

[4] McKathan's conditions of supervised release expressly permitted Goodwin to conduct periodic reasonable searches of McKathan's residence; the conditions permitted Goodwin to remove computer equipment "for the purpose of conducting a more thorough inspection." (McKathan I, Doc. 23 at 7).

He further testified that the same technology would have allowed extraction of the child pornography that was found on the phone.

In sum, before McKathan made compelled statements, Goodwin knew: of McKathan's prior sex offense conviction; that McKathan was subject to internet usage restrictions; that a Facebook page in McKathan's name was created; that the Facebook profile was accessed through "Facebook for Android"; that there was an Android device in plain view at McKathan's residence where McKathan lived alone. At this point, viewing the totality of the circumstances known to Goodwin, Goodwin had reasonable suspicion to suspect McKathan was violating the terms of his probation and to conduct a reasonable search therefrom. Moreover, the Court finds credible Goodwin's assertion that the phone would have been seized and searched regardless of McKathan's answers to Goodwin's questions. Also, the evidence established that a search without the PIN code could have been executed. "Given the circumstances of the discovery of the phone, the restrictions on [McKathan's] internet usage… there is a reasonable probability that the evidence of child pornography would have been discovered during a lawful search of the phone for evidence of a probation violation." United States v. Bishop, 683 Fed.Appx. 899, 909 (11th Cir. 2017). Accordingly, the first requirement is met.

As to the second requirement, McKathan contends the United States did not make this showing because Homeland Security did not begin an "active investigation" prior to Goodwin going to McKathan's residence on September 19, 2014. McKathan also argues the Homeland Security investigation is incurably tainted because Anderson relied exclusively on Goodwin's statements (which encompass McKathan's compelled statements) to secure a search warrant. McKathan's focus on Homeland Security's search warrant is misplaced. The "active investigation" began when Goodwin legally discovered that McKathan had likely accessed the internet using an

10

Android phone. The investigation continued when Goodwin legally accessed McKathan's home and saw the Android phone in plain view.

As noted *supra*, "'active pursuit' does not require the government to 'have already planned the particular [legal] search that would obtain the evidence." Watkins, 981 F.3d at 1238 (bracketed language in original). The evidence incriminating McKathan would have been discovered "by virtue of ordinary investigations of evidence or leads already in their possession." Id. (citing U.S. v. Johnson, 777 F.3d 1270, 1275). "Here, the investigation into whether [McKathan's] use of the [phone] violated the terms of his probation is the 'lawful means which made discovery inevitable.'" Id. (citing Johnson, 777 F.3d at 1275). This search began before, and was independent of, the compelled statements. See e.g., Johnson, 777 F.3d at 1277 (noting the officer's investigation of the truck started before, and was independent of, his illegal search). "No more than reasonable suspicion was needed to conduct a warrantless search of [McKathan's] phone," and "reasonable suspicion to search for evidence of a probation violation existed…" Bishop, 682 Fed.Appx. at 907. A further search, in turn, "would have been lawful and likely would have led to the discovery of child pornography on the phone." Id. at 910.

Also, the objective of the exclusionary rule would not be met here by excluding this evidence. See e.g., Johnson, 777 F.3d at 1275 (rejecting defendant's narrow reading of active pursuit, explaining that the purpose of the active pursuit requirement was to 'exclude evidence that was not being sought in any fashion.'"). If the evidence of child pornography was not admissible, "we would put the government in a worse position than had the [alleged] misconduct not occurred, an outcome that the inevitable discovery exception was fashioned to avoid." Johnson, 777 F.3d at 1275. "Subtract the illegal search from the factual picture in this case and nothing of substance would have changed." Id. at 1274 (alteration adopted) (internal quotation marks omitted). Thus,

11

because this evidence would have otherwise been admissible, McKathan's Section 2255 is **DENIED**.

### III.       Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." 18 U.S.C. foll. § 2255, Rule 11(a). "A certificate of appealability may issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.' " Spencer v. United States, 773 F.3d 1132, 1137 (11th Cir. 2014) (en banc) (quoting 28 U.S.C. § 2253(c)(2)).

When the district court "has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). ("Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." (citations omitted and punctuation modified).). "A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part." Miller-El, 537 U.S. at 338 (quotations omitted).

The issues this Court previously considered "adequate to deserve encouragement to proceed further," warranting a certificate of appealability, have been thoroughly considered and addressed by the Eleventh Circuit. Therefore, upon consideration, a certificate of appealability is **DENIED**. McKathan has not made a substantial showing of the denial of a constitutional right,

and reasonable jurists would not find this Court's assessment of his claim as "debatable or wrong." Slack, 529 U.S. at 484.

IV.     ***In Forma Pauperis***

"An appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith." 28 U.S.C. § 1915(a)(3). A district court's finding:

> that an appeal would not be in good faith because no certificate of appealability had been issued . . . is not enough to explain why the appeal on the merits would not be in good faith, because the standard governing the issuance of a certificate of appealability is not the same as the standard for determining whether an appeal is in good faith. It is more demanding . . . [T]o determine that an appeal is in good faith, a court need only find that a reasonable person could suppose that the appeal has some merit.

Walker v. O'Brien, 216 F.3d 626, 631-32 (7th Cir. 2000). And see Ghee v. Retailers Nat'l Bank, 271 Fed.Appx. 858, 859-60 (11th Cir. 2008) (citing Coppedge v. United States, 369 U.S. 438, 445 (1962) (finding that a "party demonstrates good faith by seeking appellate review of any issue that is not frivolous when examined under an objective standard," and noting that a non-frivolous claim is one "capable of being convincingly argued," so that "where a claim is arguable, but ultimately will be unsuccessful, it should be allowed to proceed") (internal quotations omitted)); DeSantis v. United Techs, Corp., 15 F.Supp.2d 1285, 1288-89 (M.D. Fla. 1998) (stating that good faith 'must be judged by an objective, not a subjective, standard' and that an appellant 'demonstrates good faith when he seeks appellate review of any issue that is not frivolous'), *aff'd*, 193 F.3d 522 (11th Cir. 1999)).

"An appeal is not taken in good faith if it is plainly frivolous." Johnson v. Thomas, 2005 WL 3005545, *1 (S.D. Ala. November 8, 2005); Busch v. County of Volusia, 189 F.R.D. 687, 692 (M.D. Fla. Dec. 16, 1999) ("The Petitioner demonstrates good faith when she seeks appellate review of any issue that is not frivolous."). An appeal filed *in forma pauperis* is frivolous if "it

appears that the Plaintiff has little to no chance of success," meaning the "factual allegations are clearly baseless or that the legal theories are indisputably meritless." Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993). But see United States v. McCray, Nos. 4:07cr20-RH, 2012 WL 1155471, *2 (N.D. Fla. Apr. 5, 2012) ("Because the defendant has not obtained—and is not entitled to—a certificate of appealability, any appeal by the defendant will not be taken in good faith. I certify under Federal Rule of Appellate Procedure 24(a) that any appeal will not be taken in good faith and that the defendant is not otherwise entitled to proceed *in forma pauperis* on appeal[]").

In consideration of the issues addressed herein, the Court finds and certifies that any appeal by McKathan in this action would be without merit and therefore not taken in good faith. Accordingly, McKathan is not entitled to appeal *in forma pauperis*.

**V.     Conclusion**

For the reasons stated herein, Defendant's Motion to Vacate pursuant to 28 U.S.C. § 2255 is **DENIED**; McKathan is not entitled to the issuance of a certificate of appealability, and is not entitled to proceed *in forma pauperis*.

**DONE** and **ORDERED** this the **23rd** day of **February 2021**.

                           s/ Kristi K. DuBose
                           **KRISTI K. DuBOSE**
                           **CHIEF UNITED STATES DISTRICT JUDGE**